**FOTOMAT CORPORATION, Plaintiff,**

v.

**PHOTO DRIVE–THRU, INC. and Thomas D. Baldi, Defendants.**

**Civ. A. No. 75–0203.**

United States District Court, D. New Jersey.

Jan. 18, 1977.

As Amended Jan. 20, 1977.

Bleakly, Stockwell & Zink by John A. Fratto, Camden, N. J., Sullivan, Jones & Archer by Steven P. Oggel, Fredman, Silverberg & Lewis, Inc. by Welton B. Whann, San Diego, Cal., Michael A. Kaplan, Fotomat Corp., La Jolla, Cal., for plaintiff.

Duffield & Lehrer by Charles F. Duffield, and Norman E. Lehrer, Haddonfield, N. J., Daniel Zonies, Pennsauken, N. J., for defendants.

## OPINION

GERRY, District Judge.

## I. INTRODUCTION

Plaintiff Fotomat Corporation (hereinafter "Fotomat") instituted this suit against

defendants Photo Drive-Thru, Inc. and Thomas D. Baldi (an officer of Photo Drive-Thru), alleging infringement of Fotomat's registered service marks in violation of the Lanham Trade-Mark Act, 15 U.S.C. §§ 1051 *et seq.*, and the New Jersey Trademark Act, N.J.S.A. 56:3–13.1 *et seq.*, as well as violations of Fotomat's rights under the common law of trademarks and unfair competition.

Plaintiff Fotomat's motion for a preliminary injunction is presently before the Court. Plaintiff alleges that defendants have infringed upon a particular building design that plaintiff has registered as its service mark in connection with its sale of retail drive-in photographic supply store services, and it seeks injunctive relief.[1] For purposes of its preliminary injunction motion, plaintiff seeks relief only for infringement of its registered service mark and building design under federal trademark and unfair competition grounds, and thus other causes of action that plaintiff urged in its complaint are not presently under consideration.[2]

Plaintiff Fotomat and defendant Photo Drive-Thru are competitors in the business of film processing. Each party dispenses its goods and services from small, free-standing booths ("kiosks") located in parking lots, designed to accommodate drive-in customers in automobiles. Fotomat alleges that the building design of the Fotomat kiosk is protected by a registered service mark which has been infringed by Photo Drive-Thru's construction and operation of kiosks having confusingly similar design.

Second, Fotomat alleges that Photo Drive-Thru has infringed this service mark through use of a confusingly similar logo in its advertising brochures, business stationery and miscellaneous envelopes, receipts and the like.

Third, Fotomat alleges that Photo Drive-Thru has engaged in unfair competition by deceptively palming off its goods and services as those of Fotomat.

The Court has heard four days of testimony on plaintiff's application for a preliminary injunction. After reviewing the testimony, affidavits, exhibits and excellent briefs of both parties, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. *Background Information*

1. Plaintiff Fotomat and defendant Photo Drive-Thru are competitors in New Jersey, New York and Pennsylvania, and both are engaged in the business of selling photographic products and film processing services.

2. Fotomat opened its first retail sales outlet in 1967 in San Diego, California. By June 1, 1973, 25 Fotomat outlets were oper-

---

1. Plaintiff seeks a preliminary injunction which:

 (a) orders defendants to alter the appearance of defendants' existing drive-in photographic supply store buildings to eliminate confusion with plaintiff's building design;

 (b) restrains defendants from operating any new buildings similar in appearance to plaintiff's building design;

 (c) restrains defendants from distributing any advertising literature or other documents which contain any depiction similar in appearance to plaintiff's building design;

 (d) restrains defendants from otherwise infringing upon Fotomat's building design or service mark registration;

 (e) orders defendants to surrender all copies of advertising literature or other documents depicting a building which infringes upon plaintiff's building design or service mark registration.

2. The complaint, as amended, alleges that defendants have:

 (a) infringed upon Fotomat's right to exclusive use of its registered service mark, "Fotomat Drive-Thru," in violation of 15 U.S.C. § 1114(1);

 (b) infringed upon the Fotomat building design embodied in its service mark registration, in violation of 15 U.S.C. § 1114(1);

 (c) tortiously palmed off defendants' own products and services as those of Fotomat in violation of the common law of unfair competition;

 (d) falsely designated the origin of defendants' goods in violation of 15 U.S.C. § 1125(a);

 (e) infringed Fotomat's service mark rights in its building design in violation of §§ 11 & 12 of the New Jersey Trademark Act, N.J.S.A. 56:3–13.11, 13.12 (Supp.1975).

ating in New Jersey, 105 in New York and 57 in Pennsylvania. (Ex. D).

3. Defendant Photo Drive-Thru opened its first retail sales outlet in June, 1973, in Collingswood, New Jersey. (Ex. F at 68). Photo Drive-Thru operates approximately 57 retail outlets in the three state area of New Jersey, New York and Pennsylvania, (Tr. 3–123), while Fotomat's operations grew to 266 outlets in these states by June 1, 1975, and 2,267 outlets in the United States and Canada by January 1, 1976 (Ex. D).

4. Fotomat and Photo Drive-Thru both offer products and services to amateur photographers (Ex. D & Ex. F at 108–109).

5. Both parties conduct their businesses in similar modes from small free-standing booths (hereinafter called kiosks), generally situated in shopping center parking lots in such a way that a customer may conduct transactions directly from an automobile.

B. *The Registered Service Mark and Symbolic Logos*

6. Fotomat is the owner of United States Service Mark Registration No. 911,-388, registered April 13, 1971, on the principal register of the U.S. Patent and Trademark Office. (Ex. B). Fotomat's service mark registration is shown at *Appendix A* to this Opinion. There is no dispute that plaintiffs are prior owners of this service mark.

1. *Similarity of Logos*

7. The Fotomat service mark, as shown below at *Appendix A,* consists of a depiction of a rectangular booth, shown from a diagonal view (*i.e.*, not a cross-sectional view). This depiction shows curbing running along the front edge of the booth, enclosing plantings of smaller shrubs shown on each side of the booth. The booth is topped by an overhanging roof having three tiers, trapezoidal in overall design if viewed from the front. The roof design is triangular if viewed from the sides of the booth rising to the peak of the roof. This service mark shows no words or other lettering.

8. Fotomat's evidence shows that sufficiently similar reproductions of this service mark have been displayed on Fotomat's film boxes, merchandising bags, coupons, refund vouchers, business envelopes, customer service requests, point of sale ads and circulars, repair orders, reports of accident or loss, refund logs and letterheads. (Exs. 1–10 of Ex. S; Exs. 9–11 of Ex. D). Fotomat's service mark is sometimes accompanied by the words Fotomat or Fotomat Corporation. Fotomat's registered service mark has been relatively faithfully represented (although in no instance copied exactly) on the merchandising bags, coupons, vouchers, etc., listed above. The service mark logo was in general use prior to 1973.

9. Fotomat has also presented evidence of extensive advertising which showed photographs of various kiosks on sites with an automobile in front of the booth in each photo (Exs. 1–8 of Ex. D; Exs. 1–2 of Ex. E), or drawings of a booth with automobile (Exs. 3–4 of Ex. E). Such advertising has appeared in national and local publications circulated in the relevant geographical areas. The advertising has contributed to the fame of the logo as registered to the limited extent that the logo has occasionally been relatively faithfully reproduced as a symbol in the drawings, while the photographic ads portraying a kiosk in actual use depict the service of retailing itself rather than a symbol of that service. There is, however, sufficient symbolic content in the advertisement drawings of the logo-type mark (as opposed to functional content of the advertisement photographs of services actually being rendered from a kiosk) to justify recognition of the registered logo as a famous mark symbolizing the origin of Fotomat's services (as opposed to the literal depiction of the manner of procuring such services in the normal conduct of Fotomat's retailing).

10. Defendant Photo Drive-Thru has adopted an advertising logo subsequent to 1973 which is shown as *Appendix B* to this Opinion. The Photo Drive-Thru logo is a silhouette view of a small free-standing booth with an overhanging slanted roof with an automobile beside the booth. The

words Photo Drive-Thru sometime appear in connection with this logo.

11. The Court finds that the Photo Drive-Thru logo when viewed as a whole is similar in overall appearance to the registered Fotomat service mark.

12. When used in connection with film processing services, Fotomat's logo is an arbitrary and fanciful symbol, which has also become a famous mark, capable of indicating the source of Fotomat's products and services. Competitors may choose from a universe of other symbols to distinguish their own products. There is no reason why defendants could not have adopted a logo other than their illustration of a kiosk as a symbol to identify and distinguish their business and services.[3] The value of the registered logo as a symbol indicating the origin of Fotomat's products and services is entitled to protection from infringement by Photo Drive-Thru's similar logo if the requisite likelihood of confusion is demonstrated. (This finding does not apply to the building designs of the parties' kiosks for reasons discussed below).

### 2. Likelihood of Confusion of Logos

13. The Court finds that confusion caused by the similarity of Photo Drive-Thru's logo to Fotomat's registered service mark has been demonstrated by the evidence with a sufficient degree of likelihood. There is ample evidence that members of the public have mistakenly attempted to use defendant Photo Drive-Thru's coupons, processing receipts, promotional literature and price lists at Fotomat outlets, and that defendants' logo appeared on these items. (Exs. G–9, G–17, O, T; Tr. 2–88 to 2–92, 2–137 to 2–140 and 3–27 to 3–30; Exs. AI, AC–1).

---

**3.** It does not matter that certain aspects of defendant's logo are different from the Fotomat service mark. When used as a two-dimensional symbol, a logo depicting practically any sort of kiosk, whether or not similar in particular details, would probably be "similar" to Fotomat's mark for trademark purposes when viewed as a whole and when used to symbolize film processing services.

14. For example, a booklet of Photo Drive-Thru coupons is in evidence (Ex. T), which was distributed by defendant Baldi personally. Fotomat's customers subsequently attempted to use such Photo Drive-Thru coupons to obtain discounts and merchandise at Fotomat on numerous occasions, unaware of any differences between Fotomat and Photo Drive-Thru. (Tr. 3–26 to 3–30).

15. When the registered Fotomat logo (*Appendix A*) is viewed as a whole when used in connection with retail photographic supplies and services, the Court finds that the average customer is likely to be confused by the similar Photo Drive-Thru logo (*Appendix B*).

### C. The Kiosk Structures and Building Designs ·

### 1. Similarity of Kiosks

16. Plaintiff Fotomat has constructed retail outlets which are similar to each other in general design and appearance, consisting generally of a rectangular booth placed on a concrete island with a shrubbery planter at either side of the booth. The booth is covered by a sloped, overhanging roof. The roof is three-tiered, and its four sides rise forming a pointed roof approximately half again as high as the rectangular booth structure on which it rests.

17. The Fotomat booth has windows on three sides, with a window forming the entire width of one side and about two-thirds of the width of the front and back. Photographs submitted into evidence show that Fotomat has not been consistent in particular aspects of its building design and materials.[4] The Court finds that there is no single design to which plaintiff's kiosks invariably conform.

---

**4.** For example, some Fotomat kiosks have a masonry base (Ex. Q–17), while others do not (Ex. Q–16); most kiosks have a three-tiered roof (Ex. Q–6), while a simple untiered roof design has also been used (Ex. Q–12); some kiosks have shrubs planted on both sides (Ex. Q–19), while others have but one planting (Ex. Q–10).

18. Nonetheless, for purposes of comparison, the Court considers the standard Fotomat kiosk as that which is shown in photographs in evidence as Exs. Q–14, 15, 16, depicting a Fotomat kiosk in Blenheim, New Jersey, described by Fotomat's area manager as "the normal Fotomat building with no alterations to it whatsoever," which is "the standard-type store." (Tr. 2–147 to 148). A photograph of this Fotomat kiosk is reproduced as *Appendix C* to this Opinion.

19. Photo Drive-Thru has also submitted photographs of several of its kiosks into evidence. Defendant's Ex. DT–5 consists of seven photographs of one Photo Drive-Thru kiosk which has been identified as the standard Photo Drive-Thru design for approximately 49 of the 57 retail outlets at issue in this litigation. (Tr. 3–125, 126). This design consists of a small booth on a concrete platform, covered with an overhanging roof. The roof is trapezoidal in shape whether viewed from the front or sides and is flat on top. An ornamental fence goes around the top of the roof (a so-called "widow's walk"), with a flagpole and flag raised from each of the four corners of the fence on the top of the roof. Visually, the posts of the fence on the roof and flagpoles continue the lines of each corner of the booth below, interrupted by the overhanging roof. There is also evidence that some Photo Drive-Thru kiosks employ different designs.[5] The booth has large windows on all four sides, such that virtually the entire width of each wall is glass. The roof has the words "Photo Drive-Thru" on front and back and (in lettering of approximately equal size) "Kodak Film" on each side.

20. The Court considers the photographs of Ex. DT–5 to be a representative depiction of the standard Photo Drive-Thru design. A photograph of this Photo Drive-Thru kiosk is reproduced as *Appendix D* to this Opinion.

21. Scale models of one of the Fotomat units and one of the Photo Drive-Thru units were introduced into evidence as Exs. DT–3 and DT–4 respectively. (Tr. at 3–64). The parties have stipulated, and the Court accepts, that these Exhibits are accurate scale models of a Fotomat building and a Photo Drive-Thru building, but that each party has some actual kiosks which vary from the respective models. (Tr. at 3–59 to 61).

22. The Court finds that there are substantial, decisive differences between the standard building designs employed by Fotomat and Photo Drive-Thru. The Court finds that the building designs are similar in functional respects only; *i.e.,* both kiosks are small free-standing structures situated in parking lots, designed for one employee and designed to be accessible directly from automobiles. Both designs have an overhanging roof in common, which is functionally necessary to protect the booth, its occupant and the customer from the elements. (Tr. 2–58). The Court finds that in neither booth is the amount of this overhang exaggerated sufficiently to be regarded as fanciful, artistic, creative or nonfunctional. These functional advantages of the overhangs justify this similarity.

23. The rectangular shape of the Photo Drive-Thru base structure is similar only in functional aspects of permitting easy construction and maximizing the area of contact with customers at the sides of the booth. The base structures differ significantly in window design and lighting arrangement.

24. The Court also finds that the kiosks are significantly different in all aspects of the design which are nonfunctional or fanciful, artistic and arbitrary: the three-tiered Fotomat roof, the Fotomat shrubbery and the pointed Fotomat roof, as contrasted

---

5. Several Photo Drive-Thru kiosks have no flags on the roof (Exs. A, AR–11). Five newer Photo Drive-Thru booths embody a slightly different design. This newer design was represented by three photographs, Ex. AA (Tr. 3–106) and by five other photographs, Ex. DT–7 (Tr. 3–126 to 143). The difference lies in a larger, overhanging flat slab in place of the widow's walk fence. The overhanging roof is also reduced in height. The flag motif is retained but, due to the wider flat roof, the flagpoles describe a larger rectangle than that of the booth itself.

to the Photo Drive-Thru widow's walk, the Photo Drive-Thru flags, the flat-topped Photo Drive-Thru roof and the use by Photo Drive-Thru of glass on all sides of the booth.[6]

25. The building designs, when viewed as a whole in the context of an actual functioning retail structure, are dominated by functional considerations. Prohibiting similarity in the functional aspects such as sloped, overhanging roofs and rectangular bases would foreclose broad alternatives necessary to the efficient conduct of defendants' competitive business. The test of confusing similarity in building design protection, accordingly, is confined to the design elements which do not contribute principally to functional utility.

### 2. *Likelihood of Confusion of Kiosk Designs*

26. The Court finds that confusion between the building designs has occurred or is likely to occur only with respect to the gross functional aspects which the designs have in common and not with respect to the nonfunctional, artistic or fanciful aspects which so clearly differentiate them. Plaintiffs have demonstrated generalized confusion between Fotomat and Photo Drive-Thru in affidavits of customers (Exs. G-3, G-6, G-7, G-11, G-15, G-16, W, X, and Y), affidvits of Fotomat employees reporting dealings with confused customers (Exs. G-1, G-4, G-5, G-8, G-9, G-13, G-14, G-17, G-18, G-19, G-20, G-22, G-23, G-24 and G-26), a newspaper article which mistakenly reported that a Fotomat booth was blown over in a windstorm when in fact a Photo Drive-Thru booth had been blown over (Ex. AF), and testimony of two Fotomat customers, Robert Horn (Tr. 10–31) and Eleanor Miley (Tr. 31–46).

27. The Court first considers the testimony of Mr. Horn and Mrs. Miley. Mr. Horn's confusion stemmed from his belief that all film processing stores in parking lots are Fotomats. (Tr. 11, 15). "I felt they were all Fotomat stores. Any time I saw a small building in a parking lot that processed films, I thought they were all Fotomat." (Tr. 15; *compare* Tr. 18: "I understand now that there are many companies, or there are at least two now that I know of.") Mr. Horn made reference to the sloped roof effect as a source of confusion, such that when he saw a Photo Drive-Thru kiosk, the sloped roof was a contributing factor. (Tr. 11–12). His awareness of Fotomat's slanted roof design undoubtedly was enhanced by the fact that as a construction contractor, Mr. Horn had been approached by Fotomat regarding construction of a roof for one of their kiosks. (Tr. 14). At any rate, the witness, an amateur photographer, said that his confusion was not so great that he ever actually approached the Photo Drive-Thru booth to make a transaction (Tr. 15), and furthermore, his only contact with Photo Drive-Thru was by telephone. (Tr. 17–18).

28. Mrs. Miley testified for Fotomat that she had once seen a kiosk in the middle of a big parking lot which she assumed was a Fotomat because she had never seen any other type of stores in her county that were drive through photo stores (Tr. 34), by which she meant "[a] small cube like structure with a large roof that you can drive through." (Tr. 36). The witness also felt that the roof appeared oversize for the size of the building, that the shape and slant of the roof made her think it was a Fotomat (Tr. 34), and that one-third of the building structure is roof. (Tr. 43). This witness's articulation of the concept of a distinctive slant of the roof is her only reference to any design characteristic which could distinguish Fotomat from other small booths in parking lots, yet it is clear that the major

---

**6.** It is true that service mark protection may properly prohibit the use of any and all colors in an otherwise similar design. In the instant case, however, where the Court has identified so many distinctions among the nonfunctional components of the building design, it may be proper to note that the colors are also distinctive: Fotomat generally employs a yellow roof and blue base, while Photo Drive-Thru principally uses an orange roof with brown base. It would ignore common sense (as well as each party's faith in its own color scheme) to say that colors are not a relevant distinguishing device.

reason for her confusion was not any distinctive design feature but rather the existence of a booth with drive-up facilities for processing film. (Tr. 33, 34, 36, 43). As in the case of witness Horn, Mrs. Miley never mistakenly approached the store or transacted business, nor did she come within 100 yards of the Photo Drive-Thru kiosk. (Tr. 38). Mrs. Miley also testified that she made no mistake about a second Photo Drive-Thru kiosk when she drove past it closely enough to read the sign identifying it as such. (Tr. 44–45).

29. The Court has also reviewed affidavits of customers attributing confusion to the appearance of the Photo Drive-Thru kiosk. In the affidavits which allege confusion, the source of the confusion is not specified beyond the general statement that the Photo Drive-Thru and Fotomat kiosks look alike. (*See, e. g.,* Exs. G–11, G–15, G–16). Furthermore, these customer affidavits generally fail to indicate that customers have mistakenly made purchases at Photo Drive-Thru thinking it to be Fotomat; in some cases, the confusion was dissipated upon seeing the Photo Drive-Thru name, while in others the confusion was not great enough that the affiants actually made purchases at Photo Drive-Thru.

30. Likewise, the strikingly similar affidavits of Fotomat employees do not convince the Court that customer confusion is likely to occur due to any aspects of Photo Drive-Thru's building design which are similar to any distinctive elements of Fotomat's building design. For example, several Fotomat employees reported conversations with customers who believed that the kiosk damaged in the windstorm was a Fotomat store when in fact it was a Photo Drive-Thru. Again, general appearance alone is mentioned. No affiant traced the similarity to any aspect of the Fotomat design which could be capable of distinguishing Fotomat from other rectangular small drive-in photo processing booths in

parking lots. Where the overall similarities between Fotomat and Photo Drive-Thru are based upon functional considerations, the Court is unwilling to conclude that similarities in distinctive, fanciful or artistic design characteristics have caused or are likely to cause confusion where no such particularized confusion is apparent from the evidence.

31. While proof of confusion stemming from similarities in distinctive aspects of the building designs may be forthcoming at a full hearing on the merits, the Court is unconvinced by the evidence now before it that such similarities in distinctive, nonfunctional features exist or that confusion is likely to result.

## III. CONCLUSIONS OF LAW AND DISCUSSION

### A. *Jurisdiction*

The Court has jurisdiction over the subject matter of this action since it arises under the trademark statutes of the United States. 15 U.S.C. § 1121; 28 U.S.C. § 1338. The Court also has injunctive power to prevent the violation of plaintiff's alleged rights as registrant of a work registered in the Patent and Trademark Office. 15 U.S.C. § 1116.[7]

### B. *Standards for Preliminary Injunction*

A preliminary injunction is warranted if there is an affirmative showing of four elements: probability of success on the merits at trial; irreparable injury *pendente lite* if the injunction is not granted; maintenance of the status quo; and a balance of equities in favor of plaintiff. *Coffee Dan's, Inc. v. Coffee Don's Charcoal Broiler,* 305 F.Supp. 1210, 1213 (N.D.Cal.1969); *see Tefal, S.A. v. Products International Co.,* 186 U.S.P.Q. 545, 547–548 (D.N.J.1975), *aff'd,* 529 F.2d 495, 497 (3d Cir. 1976); *Chips 'N*

---

**7.** 15 U.S.C.A. § 1116 (Supp.1975) provides in relevant part:

> The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to

> the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office.

*Twigs, Inc. v. Chip-Chip, Ltd.*, 414 F.Supp. 1003, 1012–13 (E.D.Pa.1976). Because the preliminary injunction is an extraordinary remedy, the Court should not grant a petitioner's request if it finds that these equitable requirements are not met. *See Dymo Industries, Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964); 4 *Callman, Unfair Competition*, § 88.3 (3d ed. 1967).

### C. Service Mark Infringement

The owner of a registered trademark or service mark is entitled to relief in a civil action, pursuant to 15 U.S.C. § 1114(1), against any person who shall without the consent of the registrant

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . .

The defendants have offered no evidence which rebuts the statutory presumption of 15 U.S.C. § 1057(b) [8] that Fotomat's service mark was validly registered with the U.S. Patent & Trademark Office, and that Fotomat has exclusive right to use the mark in commerce in connection with retail drive-in photographic supply store services.

The likelihood of public confusion as to the source of goods is, of course, the ultimate test in an action for trademark infringement. 15 U.S.C. § 1114(1); *Paula Payne Products Co. v. Johnson Publishing Co., Inc.*, 473 F.2d 901, 902 (Cust. & Pat. App.1973).

Before reaching the ultimate issue of the likelihood of confusion, however, a court must be satisfied that federal trademark protection shelters the particular use of a service mark which is alleged to be infringed. In short, "the validity and nature of the mark for which protection is sought must be determined before the issue of infringement can be properly resolved." 3 *Callman, Unfair Competition*, § 84 (3d ed. 1967). The Court's inquiry cannot stop with the discovery of a valid registration, despite the fact that the registration carries a strong presumption of validity under the federal trademark laws, *see e. g., Miss Universe, Inc. v. Patricelli*, 408 F.2d 506, 509 (2d Cir. 1969), because the scope and nature of the registered mark must be probed to determine whether federal law extends that service mark's protection to encompass the manner of alleged infringement, *see Sylvania Electric Products v. Dura Electric Lamp Co.*, 247 F.2d 730, 732 (3d Cir. 1957).

In deciding whether Fotomat has demonstrated probable success on the merits to support a preliminary injunction against service mark infringement, the Court will first discuss whether the defendants have infringed Fotomat's registered service mark (see *Appendix A*) by use of a similar symbolic logo (see *Appendix B*). Second, the Court will discuss whether Fotomat's building design (see *Appendix C*) has been infringed by Photo Drive-Thru's kiosk (see *Appendix D*). Whether it is probable that Fotomat will prevail in its claim of unfair competition due to defendant's alleged palming off of its goods and services for those of Fotomat is considered in part III.D, *infra*.

### 1. Service Mark Infringement (Logo)

Protection for service marks is provided for by section 3 of the Lanham Act, 15 U.S.C. § 1053 (1970), on generally the same terms as in the case of trademarks. A service mark is used to identify the services of the user and distinguish them from the services of others in the same way that a

---

**8.** 15 U.S.C. § 1057(b) (1970) provides in relevant part:

A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate, subject to any conditions and limitations stated therein.

trademark is used to identify and distinguish the user's goods.[9]

Service mark infringement is governed by the general principles applicable to trademark infringement. *Boston Professional Hockey Ass'n. v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004 (5th Cir. 1975), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); 3 *Callman, Unfair Competition,* § 68.1 (3d ed. 1967).

Whether the Photo Drive-Thru logo infringes upon Fotomat's registered service mark depends upon the likelihood of public confusion as to the source of Fotomat's services occasioned by defendant's use of a confusingly similar mark, *Tefal, S.A. v. Products International Co.,* 186 U.S.P.Q. 545, 548 (D.N.J.1975), *aff'd,* 529 F.2d 495 (3d Cir. 1976).

■ In assessing the likelihood of confusing similarity between a trademark and an allegedly infringing mark, several factors are to be weighed: the degree of similarity of the marks in appearance, the intent of the alleged infringer, the relation in use and manner of marketing between the goods, the similarity of trade channels, and the fame of the prior mark. *Tefal, S.A. v. Products International Co.,* 186 U.S.P.Q. 545, 548 (D.N.J.1975), *aff'd,* 529 F.2d 495 (3d Cir. 1976). The likelihood of confusion is to be tested in the eyes of "ordinary purchasers, buying with ordinary caution," *McLean v. Fleming,* 96 U.S. 245, 251, 24 L.Ed. 828 (1878), including people whose purchases are governed by appearance and general impressions, *Dresser Industries, Inc. v. Heraeus Engelhard Vacuum, Inc.,* 395 F.2d 457, 462 (3d Cir. 1968), *cert. denied,* 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968).

The plaintiff need not prove that instances of actual confusion have occurred; it is enough for relief that plaintiff prove only that such confusion is likely to be caused by use of a similar mark. 15 U.S.C. § 1114(1).

■ In the instant case, the Court has considered each party's logo as a whole, to determine the general sense impressions made by the respective symbols. *See Q–Tips, Inc. v. Johnson & Johnson,* 206 F.2d 144 (3d Cir. 1953), *cert. denied,* 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953); *G. D. Searle & Co. v. Chas. Pfizer & Co., Inc.,* 265 F.2d 385, 388 (7th Cir. 1959), *cert. denied,* 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 (1959). The Court has found as a matter of fact that the Photo Drive-Thru logo bears a high degree of similarity to the Fotomat service mark. A great similarity has also been found to exist in the use of each mark both as an advertising symbol and as a corporate identification on numerous service-related forms, envelopes and the like. Each party uses its logo in connection with retail photographic services of a nearly identical scope. Finally, Fotomat has promoted its service mark symbol (or a reasonable likeness thereof) in advertising to a degree sufficient to justify recognition of the fame of Fotomat's mark.

Furthermore, the Court has found that confusion by the average purchaser due to defendant's use of its logo is likely, as demonstrated by actual confusion involving advertisements, coupons and other items bearing the logo.

Accordingly, the Court finds that Fotomat has demonstrated probable success on the merits of its service mark infringement action with respect to the Photo Drive-Thru logo. These conclusions are limited specifically to the infringement of Fotomat's service mark by defendant's symbolic logo and are not applicable to the separate action for infringement of Fotomat's building design

---

**9.** Section 45 of the Lanham Act, 15 U.S.C. § 1127 (1970) provides at paragraphs 9 & 10:

The term "trade-mark" includes any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others.

The term "service mark" means a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others. Titles, character names and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

by defendant's kiosk for reasons discussed in Part III.B.2 *infra.*

### 2. Building Design Infringement

The question of whether federal trademark protection extends to Fotomat's entire retail outlet structure is now considered. Fotomat alleges that the Fotomat kiosk is itself a symbol of Fotomat's services, a "three-dimensional billboard" which identifies Fotomat as distinguished from all other providers of film processing. The kiosk itself has become a "famous mark" according to Fotomat due to extensive advertising of the concept with photographs of the Fotomat kiosk.

The Court's hesitation to adopt this view stems in part from the difference between the two-dimensional service mark as registered and the three-dimensional structure as utilized for the functional purpose of retailing, notwithstanding the resemblance between the registered mark and the actual constructed building. As explained below, the Court cannot say that it is probable that federal trademark law was meant to extend its protection to Fotomat's kiosks in their entirety or at least to the elements of the Fotomat building design that are generally functional in design, appearance and use.

In the instant case, extending service mark protection to all aspects of a retail outlet merely because a line drawing of the building has been federally registered as a service mark would sweep a protective path more widely than the Lanham Act allows for reasons now discussed.[10]

■ At the hearing in this matter, the Court invited the parties to address the issue of protectability of a building design as a service or trademark. Fotomat directed the Court's attention to only one such judicial decision. In that case, involving Fotomat itself, a Florida state court found that Fotomat's building design had a "distinctive appearance . . . due to its arbitrary and fanciful design [which] serves to identify the source of the goods and services it sells," such that the design was entitled to protection under Florida common law and statutory law. *Fotomat Corp. v. Houck,* 166 U.S.P.Q. 271, 272 (Fla.Cir.Ct., Pinellas County 1970). That decision, based upon a state court's interpretation of state law, has persuasive value but is not binding upon this Court's interpretation of federal law. Furthermore, although it is true that facts necessarily determined in a prior suit between the same parties are conclusively established even for a later different cause of action, *Seven-Up Company v. Bubble Up Corp.,* 312 F.2d 472, 50 CCPA 1012 (1963), a court may not use prior factual determinations to bind a person who was not party or privy to the prior action. The opinion in *Fotomat Corp. v. Houck, supra,* is devoid of citation to legal authority to suggest why common law trademark might protect this retail structure. Furthermore, the Court notes that infringing structure in that case appears to be a nearly identical copy of the Fotomat design, which is not the case here.

■ Service mark protection has on occasion been accorded to three-dimensional objects. For example, a purely ornamental, nonfunctional design for a bottle is entitled to trademark protection. *In re Mogen David Wine Corp.,* 328 F.2d 925, 51 CCPA 1260 (1964); *Lucien Lelong, Inc. v. George W. Button Corp.,* 50 F.Supp. 708 (S.D.N.Y. 1943). However, it has long been the continuing federal policy that trademark protection may not extend to configurations which contribute functional or utilitarian features to the depicted article. *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 119–20, 59 S.Ct. 109, 83 L.Ed. 73 (1938); *In re Honeywell, Inc.,* 532 F.2d 180 (Cust. & Pat.App.1976); *Best Lock Corp. v. Schlage*

---

10. As discussed above, the scope and nature of a registered service mark must be determined before the issue of infringement of an extension of that mark can be resolved. The finding of infringement of Fotomat's service mark by defendant's logo cannot automatically imply that Fotomat's building design (an extension of the registered service mark) has been infringed by defendant's kiosk. Such an extension without inquiry would overlook the significant differences in purpose between the symbol and the kiosk which may justify a different application of trademark principles.

*Lock Co.*, 413 F.2d 1195, 56 CCPA 1472 (1969).[11]

■ The reluctance to protect articles which are on the whole utilitarian is grounded in the public policy that everyone has the right to use an article for its functional purpose, subject only to limited patent protection. *See Best Lock Corp. v. Schlage Lock Co.*, 413 F.2d 1195, 1199, 56 CCPA 1472 (1969). Trademark law recognizes an overriding public policy of preventing monopolization of the use of articles which are mainly functional or utilitarian, *In re Deister Concentrator Co.*, 289 F.2d 496, 48 CCPA 952 (1961), as opposed to articles which are mainly arbitrary, artistic and designed to perform a source-indicating purpose, *Boston Professional Hockey Ass'n. v. Dallas Cap & Emblem Mfg. Co.*, 510 F.2d 1004 (5th Cir.), *cert. denied*, 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

■ Whether the primary purpose of an article is functional or source-indicating is a question of fact, *In re Honeywell, Inc.*, 497 F.2d 1344, 1348 (Cust. & Pat.App.1974), *cert. denied sub nom. Dann v. Honeywell*, 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974). The issue to be resolved is whether the subject matter "was of a functional nature; i. e., in essence utilitarian or dictated for reasons of engineering efficiency." *Id.*

That several of the above-cited cases deal with the issue of trademark registrability does not lessen their instructive value to this Court considering the infringement of a registered mark. The issue of extending trademark recognition and protection from infringement to a three-dimensional object patterned after a registered two-dimensional mark, where the object undoubtedly has utilitarian aspects not present in the source-indicating mark, must be answered by the application of general trademark policy.

The functionality doctrine which has long been a part of the law of trademarks is recognized in 3 *Restatement of Torts,* § 742:

> A feature of goods is functional, under the rule stated in § 741 [relating to unprivileged imitation], if it affects their purpose, action or performance, or the facility or economy of processing, handling or using them; it is nonfunctional if it does not have any of such affects.[12]

Comment (a) to § 742 states in part:

> . . . It may be functional, also, because it contributes to their utility, to their durability or to the effectiveness or ease with which they serve their function or are handled by users . . .. The determination of whether or not such features are functional depends upon the question of fact whether prohibition of imitation by others will deprive the others of something which will substantially hinder them in competition.

> A feature is nonfunctional if, when omitted, nothing of substantial value in the goods is lost. A feature which merely associates goods with a particular source may be, like a trademark or trade name, a substantial factor in increasing the

11. The Court of Customs and Patent Appeals has recognized that an article having a limited or incidental functional purpose should not be denied trademark recognition on that basis alone, provided that the mark has the overriding distinctiveness and other indicia of a trademark. As explained in *Best Lock Corp. v. Schlage Lock Co.*, 413 F.2d 1195, 1199, 56 CCPA 1472 (1969):

> [There is] the obvious fact that some articles, made in a purely arbitrary configuration (e. g., the wine bottle considered in *Mogen David*) [*supra,* 328 F.2d 925, 51 CCPA 1260 (1964)] may *perform* a function, holding wine, which could equally well be served by containers of many other shapes, and in such circumstances the *incidental* function should not by itself preclude trademark registrability

if the other conditions precedent are present. That is quite a different situation from a configuration whose purpose is to provide a functional advantage. Where such a functional purpose exists, the rule is that . . the configuration *is not registrable* as a trademark. The reason is clear. If a configuration is functional in that sense, then everyone has the right to use the configuration for its functional purpose, subject only to such exclusive right for a *limited* time as *may* exist under the patent laws. [Emphasis in original].

12. This doctrine has been adopted in recent trademark cases, *see, e. g., Application of Hollaender Mfg. Co.*, 511 F.2d 1186, 1188 (Cust. & Pat.App.1975).

marketability of the goods. But if that is the entire significance of the feature, it is nonfunctional; for its value then lies only in the demand for goods associated with a particular source rather than for goods of a particular design.

In order to determine whether the Fotomat kiosk, or substantial parts thereof, is primarily "functional," the relevant questions are whether the Fotomat kiosk, as a whole, is designed and constructed in a manner which primarily suits its purpose as a retail sales store; whether the Fotomat kiosk design contributes to the effectiveness with which Fotomat serves its customers; and whether such functional purposes are merely incidental to the kiosk's purpose as a source-indicating device.

■ In the instant case, the Court is persuaded that the article in question—the Fotomat kiosk—when considered as a whole—is primarily functional in design, even though it has secondary value as a symbol identifying the origin of Fotomat's services. The kiosk is not primarily a "three-dimensional billboard" because it is actually used as an efficient drive-in retail outlet for photographic supplies. The kiosk is an efficient one-person store, not an advertising billboard. Fotomat does not possess a general right to monopolize the sale of photographic products from kiosks in parking lots. If Photo Drive-Thru operates similar kiosks, it will be an infringer of Fotomat's service mark only if the nonfunctional features are so confusingly similar as to mislead purchasers in the origin of Photo Drive-Thru's products. This Court has found that Photo Drive-Thru employs a building design which is not confusingly similar in its artistic or nonfunctional aspects.

■ While it is true that a court must examine a service mark as a whole when it determines issues relating to similarity, *Q–Tips, Inc. v. Johnson & Johnson,* 108 F.Supp. 845 (D.N.J.1952), *aff'd,* 206 F.2d 144 (3d Cir. 1953), *cert. denied,* 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953), in the instant case the Court cannot overlook the fact that Fotomat's building design, as employed in the construction and design of its kiosks, is largely functional in character. In such a case looking at the design as a whole would be likely to foreclose many types of drive-in booths which are necessarily of a similar design in functional respects because such booths are designed to provide retail services to customers seated in automobiles. Aspects of a building's design should remain in the public domain unless they are primarily arbitrary and distinctive.

Fotomat should not be able to prevent competitors from employing a type of retail outlet which is well-suited to the conduct of drive-in sales by asserting a building design service mark which is primarily functional. Unique or arbitrary aspects of the building design should, however, be protected from infringement since there is no public interest in preserving such devices for the public domain. Accordingly, the arbitrary, nonfunctional parts of the Fotomat retail building design are central to the determination of infringement by the Photo Drive-Thru design.

It is clear that Photo Drive-Thru has designed and constructed significant embellishments of a nonfunctional character which distinguish its design from that of Fotomat. In the roof area alone, which Fotomat urges as the main distinctive feature of its building design, Photo Drive-Thru employs a flat roof, widow's walk and flags which are completely different from Fotomat's distinctive three-tiered roof design.

This does not mean, of course, that in appropriate cases substantial elements of a building design or even an entire structure should not be considered a service mark duly entitled to full protection from infringement.[13] For example, where the building design of a chain of restaurants is

**13.** There is some indication in the literature of trademarks that in appropriate cases a uniquely designed chain of stores might be protected from imitation on the theory of preventing mis-

appropriation of a competitor's trade values. A leading commentator, after noting that in usual cases a building could be freely copied if its plans are unprotected by copyright, writes:

copied in every detail, including arbitrary and distinctive design aspects, an injunction will properly be granted. In *White Tower System, Inc. v. White Castle System,* 90 F.2d 67 (6th Cir. 1937), a defendant which copied plaintiff's castle-like building design for selling hamburgers was enjoined, while in *McDonald's Corp. v. Moore,* 243 F.Supp. 255 (S.D.Ala.1965), *aff'd per curiam,* 363 F.2d 435 (5th Cir. 1966), the defendant's building design was found not to be confusingly similar to plaintiff's registered service mark inasmuch as plaintiff's famed "golden arches" were not copied nor simulated.

If, on the other hand, the configuration of "golden arches" in *McDonald's Corp. v. Moore, supra,* had been imitated, a finding of service mark infringement presumably would have resulted, because the registered configuration is fanciful, artistic and nonfunctional—its primary function is to identify the source of food services. Such comparison for purposes of service mark infringement must be limited to the arbitrary and distinctive aspects of the building designs.[14]

> If, however, a building is uniquely designed to signify, by its shape, colors or location, a particular type of business establishment, then it may well qualify as the trade dress of the respective business. Thus, for example, the distinctly designed exterior for a chain of roadside restaurants, an affiliated group of stores or a national motel operation (franchised or otherwise) serves to identify the particular type of service or merchandise offered and the shape of the building itself serves an advertising function. In such cases, *imitation by a competitor* involves misappropriation or exploitation of another's effort and expenses and deception of the public. Accordingly, the defendant's imitation of an unusual and unique design for a drive-in restaurant located within the same trade area as the original should have been enjoined. 2 *Callman, Unfair Competition,* § 61.3 at 552 (3d ed. 1967). Interestingly enough, the only case offered in support of this proposition is *Fotomat Corp. v. Houck,* 166 U.S.P.Q. 271 (Fla. Cir.Ct.1970). This reasoning is adopted herein to the extent it suggests that imitation of unusual and unique design aspects of a source-indicating retail structure may give rise to service mark infringement.

14. The conclusion that non-arbitrary aspects of a building design should normally be preserved in the public domain is buttressed by analogy

For reasons already stated, the Court concludes that Fotomat's kiosk design, when considered as a whole, is primarily functional, and that protection from infringement extends only to those design elements which are distinctive, nonfunctional or arbitrary. The Court is not persuaded that such similarities in nonfunctional design aspects exist between the Fotomat and Photo Drive-Thru building designs.

Furthermore, the plaintiff has not demonstrated that confusion between the building designs is likely to be caused by any such similarities in nonfunctional and arbitrary design aspects. The plaintiff has offered testimony for the purpose of demonstrating the likelihood of confusion by members of the film-buying public between Fotomat and Photo Drive-Thru. Proof of likely confusion is necessary but not sufficient, because the Court may grant relief only if it finds that the source of this confusion was defendant's use of a confusingly similar service mark. See *Kampgrounds of America, Inc. v. North Delaware A–OK*

> to copyright law. Professor Nimmer suggests that although architectural plans may normally be registered under the Copyright Act as drawings of a scientific or technical character, an architectural *structure* itself is copyrightable only if it can qualify as a work of art or conceivably as a reproduction of a work of art. I *Nimmer on Copyright,* §§ 26 & 57.3 (1963). Examples of architectural "works of art" include the Statue of Liberty and the Eiffel Tower. *Id.* § 26 at n.503. Recent revisions to the Copyright Act, effective January 1, 1978, do not appear to broaden the scope of such copyright protection. *See* Act of Oct. 19, 1976, Pub.L.No. 94–553, §§ 102(a)(5) & 113(b), 90 Stat. 2545, 2560.
>
> Thus, the law of copyright makes a sharp distinction between the need for protecting plans and drawings of buildings as intellectual property and the absence of such protection for structures derived from those plans. Such structures are not worthy of protection unless they are works of art or similarly inventive. The copyright analogy suggests that a building design belongs to the public domain unless it is so uniquely artistic or distinctive that it can fairly be said to exist principally as an identification symbol of the origin of the services rendered and only secondarily as a structure for transacting business.

*Campground, Inc.*, 190 U.S.P.Q. 437, 443 (D.Del.1976).

It is clear that a trademark distinguishes one vendor's goods from the goods of others, but not everything that enables goods to be so distinguished will be protected as a trademark. *In re Deister Concentrator Co.*, 289 F.2d 496, 502, 48 CCPA 952 (1961). It is equally true that any confusion between the identity of vendors of goods should not necessarily be presumed to result from service mark infringement.

As discussed above, the testimony did not demonstrate confusion caused by similarity in protected elements of Fotomat's service mark because the witnesses were either Fotomat customers who never did business with Photo Drive-Thru or Fotomat employees who did not specify the source of confusion as emanating from distinctive design features. The Court is not persuaded from this evidence that it is more likely than not that the ordinary customer is confused by any similarity in the aspects of the building designs which are distinctive for federal trademark purposes. The Court believes that confusion between Fotomat and Photo Drive-Thru is caused in part by generalized similarities in the settings of the kiosks and in part by the primacy of Fotomat in this business, such that an ordinary customer is more likely to think all such film kiosks are Fotomat outlets.

The Court is further persuaded that confusion is not primarily design-related due to testimony (offered by defendants) of three employees of Photo Image, which is a third photographic service retailer operating drive-in kiosks. Each of the Photo Image employees testified to numerous instances in which customers came to their booth thinking it was a Fotomat. (Tr. 3–114 to 3–117, and 4–8 to 4–12, and 4–18 to 4–25). Photographs of a Photo Image booth that were admitted into evidence (Ex. R–1, 2) and identified by the employee-witnesses show that Photo Image bears very little resemblance to Fotomat, other than in the functional aspects of a free-standing rectangular drive-in booth located on a parking lot. The confusion was clearly not de-sign-related. The Court is persuaded that the confusion was caused by generalized similarities in the settings and products.

The plaintiffs have not produced sufficient evidence that design-related confusion is likely. With respect to building design infringement, the Court finds an overshadowing likelihood that confusion has been caused by similarities which are not subject to service mark protection.

In conclusion, success on the merits of plaintiff's claim for service mark infringement of its building design is not probable, and plaintiff's request for preliminary injunction against Photo Drive-Thru's continued use of the latter's building design is denied.

## D. *Unfair Competition*

The essence of unfair competition is the sale of one's own goods for those of another person. *Standard Paint Co. v. Trinidad Asphalt Mfg. Co.*, 220 U.S. 446, 461, 31 S.Ct. 456, 55 L.Ed. 536 (1911); 1 *Callman, Unfair Competition*, § 4.1, at 110–111 (3d ed. 1967). Traditionally, trademark infringement is " 'but a part of the broader law of unfair competition', the general purpose of which is to prevent one person from passing off his goods or his business as the goods or business of another." *American Steel Foundries v. Robertson*, 269 U.S. 372, 380, 46 S.Ct. 160, 162, 70 L.Ed. 317 (1926); *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 412–414, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *Campbell Soup Co. v. Armour & Co.*, 175 F.2d 795, 796 (3d Cir. 1949). In short, unfair competition at common law is a species of deceit, especially through "the simulation by one person of the name, symbols or devices employed by a business rival, so as to induce the purchase of his goods under a false impression as to their origin or ownership and thus secure for himself benefits properly belonging to his competitor." 74 Am.Jur.2d, *Trademarks and Tradenames*, § 87 (rev. ed. 1974).

It is possible to be guilty of unfair competition even when trademark infringement is not present, if use of a similar but

noninfringing mark or device is combined with unfair practices in a manner which is likely to deceive purchasers regarding the origin of goods under all the circumstances. *See B. H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1259, 1262 (5th Cir. 1971); *Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1, 11 (E.D.Pa.1974); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 376 F.Supp. 1136, 1143 (S.D.Fla.1974). In the instant case, even if federal trademark infringement of the logo were not present, defendant Photo Drive-Thru's actions would nonetheless be weighed in light of the prohibitions of unfair competition through palming off defendant's products as those of the plaintiff.

Unfair competition includes not only simulation of the appearances of goods with intent to "pass off," *see, e. g., Time Mechanisms, Inc. v. Qonaar Corp.*, 422 F.Supp. 905 (D.N.J.1976), but also the simulation of appearance of business facilities or advertising methods in such a manner as to deceive the public into believing they are dealing with the originator rather than the simulator of such methods, *see, e. g.*, 74 Am.Jur.2d, *Trademarks & Tradenames*, §§ 97–100 (rev. ed. 1974); 3 *Callman, Unfair Competition*, § 61.3 (3d ed. 1967).

In the instant case, the Court recognizes the fact that Fotomat was first in the film processing drive-in field, and that Photo Drive-Thru, as a latecoming competitor, had the duty to distinguish the indicia of its business make-up in order to not mislead the public regarding the origin of its products. *Harold F. Ritchey, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960); *G. D. Searle & Co. v. Chas. Pfizer Co., Inc.*, 265 F.2d 385, 388 (7th Cir. 1959), *cert. denied*, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 (1959); *American Chicle Co. v. Topps Chewing Gum*, 208 F.2d 560, 563 (2d Cir. 1953).

Plaintiff alleges that defendants intended to bask in the popularity of Fotomat's building design by engaging in various unfair practices which are to be regarded as evidence of intent to confuse purchasers.

First, Fotomat alleges that the defendants have failed to adopt a clearly non-infringing building design, examples of which are offered in plaintiff's opening brief at 11–13. The defendants have allegedly imitated Fotomat's building design as an advertising device to mislead the film-buying public into buying Photo Drive-Thru's services at the expense of Fotomat. Relying upon cases such as *Q–Tips, Inc. v. Johnson & Johnson*, 206 F.2d 144 (3d Cir. 1953), *cert. denied*, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953), and *Ortho Pharmaceutical Corp. v. American Cyanamid Co.*, 361 F.Supp. 1032 (D.N.J.1973), Fotomat would have the Court find that defendants may be assumed to have intended to mislead the public to the extent that defendants' building design is not sufficiently different from the Fotomat kiosk to avoid appropriating the latter's good will.

The law of unfair competition recognizes that one may not simulate the distinctive appearance of the place of business or advertising signs of a competitor unless proper steps are taken against misleading the public. 74 Am.Jur.2d, *Trademarks & Tradenames*, § 97 (rev. ed. 1974). This tradition protects the use of symbols which distinguish the origin of a competitor's goods as a valuable business asset that may not be appropriated by imitation for the sake of deceiving the public. For example, a person who copies the business dress of his competitor by extending the distinctive design of signs, markings, and even the tradename of the competitor's retail premises next door to include his own store is guilty of unfair competition due to his obvious intent to deceive the public into thinking his store is part of the competitor's business. *United Cigar Stores Co. v. United Confectioners*, 92 N.J.Eq. 449, 113 A. 226 (N.J.1921). *See also White Tower System, Inc. v. White Castle System*, 90 F.2d 67 (6th Cir. 1937).

In the instant case, the Court finds that Fotomat's building design has not been imitated in distinctive aspects for the sake of unfairly appropriating Fotomat's valua-

ble distinctive symbols to confuse the public. Photo Drive-Thru, as a latecomer, has differentiated its kiosks by employing a design which is sufficiently dissimilar to all distinctive aspects of the Fotomat kiosk design.

 Plaintiff also alleges that defendant Baldi's refusal to modify his building design after Fotomat so requested in July, 1973, is further evidence of intent to deceive, and furthermore that Baldi, while employed by Fotomat, disclosed Fotomat's building plans to the designer (Russell Austin), intending to create a building design confusingly similar to Fotomat's. The Court has already found that defendants' building design is not confusingly similar; since this is so, there was no reason to compel Baldi to accede to Fotomat's 1973 requests to the defendants to modify their design, and no negative inference of intent to imitate can logically flow from Baldi's refusal to change his design. For this reason, the cases cited by Fotomat, such as *Max Factor & Co. v. Factor*, 226 F.Supp. 120, 126 (S.D.Cal.1963) and *Jockey International, Inc. v. Burkard*, 185 U.S.P.Q. 201, 207 (S.D.Cal.1975) are inapposite. The evidence before the Court does not indicate that Baldi procured a design which was calculated to imitate Fotomat's design, unlike cases of obvious mimickry, *e. g. Telechron, Inc. v. Telicon Corp.*, 198 F.2d 903, 908 (3d Cir. 1952); *Time Mechanisms, Inc. v. Qonaar Corp.*, 422 F.Supp. 905 (D.N.J. 1976). Moreover, the evidence shows that if Baldi disclosed Fotomat's design at all, it was to *avoid* imitating Fotomat's building, because Baldi said, "I don't want what Fotomat has," according to designer Austin's deposition, Ex. V–2.

 Fotomat alleges that Baldi's conduct while still an employee of Fotomat supports an inference of intent to deceive. Baldi's allegedly deceptive activities—misrepresenting the reason for his resignation from Fotomat, copying Fotomat's standard lease, and obtaining a lease site for personal use while still employed by Fotomat—even if assumed to be true—give rise at most to a deceptive course of conduct by Baldi against Fotomat in his dealings as an employee. Although the Court may not be convinced of Mr. Baldi's straight-forwardness in his capacity as a Fotomat employee, this conduct does not relate to Baldi's dealings with the film-buying public and thus it does not induce a finding that the defendants' business practices were likely to mislead purchasers.

 Fotomat also alleges that Photo Drive-Thru unfairly employs the same advertising format in an attempt to generate confusion, inasmuch as both parties use pictures or logos of their respective building designs in advertisements and business documents. The Court has found that the Photo Drive-Thru logo as used in defendants' advertising format is confusingly similar to Fotomat's logo which has been in extensive prior use, *see* Part III.C.1, *supra*. Those conclusions are equally applicable to the issue of unfair competition. Of the many, perhaps innumerable, distinctive logos which the latecoming defendant could have chosen to advertise its goods and services, it chose a drawing of a kiosk with few details to distinguish it from Fotomat's mark. The mark itself is a distinctive asset of Fotomat's business. Recognizing again that the logo, unlike the retail structure itself, serves no function other than to advertise, the Court is drawn to the conclusion that Photo Drive-Thru's use of this mark simulates the Fotomat advertising methods and indicia in a manner which unfairly appropriates Fotomat's good will with a likelihood of passing off of defendant's goods and services as those of Fotomat.

Accordingly, the Court finds that Fotomat has demonstrated probable success on the merits of its unfair competition claim with respect to defendant's logo.

## E. Preliminary Injunction Requirements

Having found probable success for the plaintiff's claims of service mark infringement and unfair competition stemming from defendant's use of a similar advertising logo, a preliminary injunction will issue if the remaining criteria are met, *see* Part III.B, *supra*.

A plaintiff who has demonstrated service mark infringement and unfair competition faces the probability of lost trade and appropriation of its good will. The damages in such a case are by their very nature irreparable and not susceptible of adequate measurement. *Tefal, S.A. v. Products International Co.*, 186 U.S.P.Q. 545, 548 (D.N.J.1975), aff'd, 529 F.2d 495, 497 (3d Cir. 1976). Plaintiff's lack of ability to control the nature and quality of services provided under an infringing service mark, even if defendant matches the high quality of plaintiff's services, constitutes irreparable injury. *Ambassador East, Inc. v. Orsatti, Inc.*, 257 F.2d 79, 82 (3d Cir. 1958); *Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.*, 414 F.Supp. 1003, 1018 (E.D.Pa.1976). Fotomat is likely to continue to suffer irreparable injury if an injunction is not granted *pendente lite.*

A properly-limited injunction is necessary to preserve the status quo. The preliminary injunction recognizes that the plaintiff has the right to be protected from probable continued diversion of its trade and good will through defendant's use of its infringing advertising logo. The Court declines plaintiff's request to order immediate impoundment of all such documents and advertising material on which the defendant's logo is displayed; the Court conceives that prohibiting continued use of the logo at the earliest feasible date will sufficiently preserve the status quo, while impounding all such materials immediately would be likely to cripple defendant's business operations until non-infringing materials could be obtained. Such an impoundment would inflict damage upon defendant beyond that necessary to preserve the status quo.[15]

Likewise, the equities balance in favor of plaintiff's preliminary injunction request. Defendants are newcomers to the field who have ignored the duty to adopt a symbol which avoids the clear possibility of conflict with an already-existing and well-established mark. *Car-Freshner Corp. v. Turtle Wax, Inc.*, 268 F.Supp. 162, 166 (S.D.N.Y. 1967); *Philco Corp. v. Winer*, 189 F.Supp. 827, 829 (S.D.N.Y.1960). Defendants have offered no proof of offsetting equities to demonstrate why their adoption of this symbol was fair or why they should not be enjoined from continued use of this symbol. Furthermore, the evidence suggests that defendants have adopted very similar modes of advertising and operating which were initiated by defendant Baldi, a former Fotomat employee. The need for these similarities is likewise unexplained. We are persuaded that the equities of the situation clearly balance in favor of the plaintiff to justify this preliminary injunction.

Accordingly, plaintiff's request for a preliminary injunction *pendente lite* against defendant's continued use of the symbolic logo, shown in *Appendix B*, is hereby granted; plaintiff's motion for a preliminary injunction against defendant's continued use of its retail kiosk structures, shown in *Appendix D*, is hereby denied. The accompanying Order is hereby entered.

Appendices to follow.

15. The Court has determined that all use of the infringing logo shown in *Appendix B*, or any similar symbol, must cease as soon as possible. The logo may not appear in newspaper advertisements or other advertising flyers subsequent to three (3) days after the date of this Order, so that defendants must immediately take steps to modify any such advertising. With respect to business supplies already in Photo Drive-Thru's possession which are customarily needed for conducting business but which contain the infringing logo, the defendants must cease use within 45 days of any such document or package which is usually received by a member of the filmbuying public. This contemplates that it would be impossible for defendant to replace all such supplies immediately, and defendants will have 45 days to obtain noninfringing business supplies.

With respect to all other business documents not normally received by the public, and in any manner whatsoever, all use of the infringing logo must cease within 60 days.

The above terms are more specifically set forth in the accompanying Order.

APPENDICES

### APPENDIX A

[ ]

[ ]

Fotomat logo (as registered, reproduced here actual size; see Finding 6, supra).

### APPENDIX B

[ ]

[ ]

Photo Drive-Thru logo (example from Ex.AC-1 reproduced here actual size; see Findings 10, 13, 14, supra).

### APPENDIX C

[

[

Fotomat kiosk (see Finding 18, supra; photographic Ex. Q-15 reproduced here enlarged and cropped slightly on sides).

### APPENDIX D

Photo Drive-Thru kiosk (see Finding 20, supra; photographic Ex. DT-5 reproduced here reduced and cropped slightly on sides).