**In re ARTHUR TREACHER'S FRANCHISEE LITIGATION.**

MDL No. 467.

Civ. A. No. 82–0043.

United States District Court,
E. D. Pennsylvania.

April 6, 1982.

John M. Elliott, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for Arthur Treacher's Fish & Chips, Inc. and Mrs. Paul's.

---

Franklin Poul, Wolf, Block, Schorr & Sol-is-Cohen, Philadelphia, Pa., for franchisees.

## MEMORANDUM AND ORDER

HANNUM, District Judge.

### I. INTRODUCTION

On January 5, 1982, plaintiff-franchisor, Arthur Treacher's Fish & Chips, Inc. ("ATFC") filed an action in Delaware County Common Pleas Court against defendant-franchisee, Georgios D. Martinos.[1] The case was removed to this Court and a motion to remand was denied on January 18, 1982.[2] The complaint alleged a violation of the covenant not to compete contained in an agreement entered into by the parties. The covenant states:

Upon termination of this Contract, whenever and however such termination may occur, Licensee will not market any seafood product, or engage as an owner, manager, partner, officer, employee or stockholder, or in any other direct or indirect capacity, in any competing business firm for three (3) years after the date of such termination, within Licensee's Area or within a ten (10) mile radius of any Arthur Treacher's Fish & Chips restaurant, unless Licensee is acting pursuant to another Standard Unit License Contract to which Arthur Treacher's is a party.[3]

Filed with the complaint was a motion for a preliminary injunction seeking an Order that defendants "[c]ease marketing any seafood products in Delaware County, Pennsylvania and in any area within ten (10) miles of any Arthur Treacher's Fish & Chips restaurants for a period of three (3) years beginning from the date of January 5, 1982, in compliance with its Standard Unit License Contract."[4]

The Court conducted a hearing on this motion for a preliminary injunction on February 8–11, 1982.[5] Because the plaintiff has not demonstrated to this Court that it will suffer irreparable harm absent a grant of the preliminary injunction, the motion will be denied. This Memorandum shall constitute the Court's findings and conclusions in accordance with Fed.R.Civ.P. 52(a).

### II. FINDINGS OF FACT

1. Plaintiff, ATFC is engaged in the business of owning and operating Arthur Treacher's Fish & Chips restaurants, and is also engaged in the business of licensing others, in return for a commission or a royalty, to own and operate Arthur Treacher's restaurants.

2. Defendant, Georgios D. Martinos, came to the United States from Greece in 1958. He was twenty-three years old at the time and he could not speak, read or write English. Since his arrival in this country

---

1. Also named as defendants in the state court action were Dorothy Martinos, Trend Enterprises, Inc. and North Atlantic Corporation. Reference to "defendant" throughout this opinion is to Georgios Martinos.

2. See Tr. at 380. The basis of removal jurisdiction asserted by defendants was diversity. Plaintiff, in its motion to remand, argued that the case had been removed improvidently due to the presence of North Atlantic—a Pennsylvania corporation like the plaintiff. This Court found that the naming of North Atlantic as a party in the state court action was a sham designed solely to defeat diversity jurisdiction. Thus, the motion to remand was denied and the removal sustained on diversity grounds disregarding the presence of North Atlantic which had been fraudulently joined for the purpose of defeating removal. See Newman v. Forward Lands, Inc., 418 F.Supp. 134 (E.D.Pa.1976).

(The designation "Tr." refers to the transcripts of hearings and arguments on various matters pending in this litigation recently conducted by the Court from January 13, 1982 to February 12, 1982. These transcripts were filed at Docket Entry No. 462–484).

3. Plaintiff's Exhibit 2, Article XIII, ¶ B; see Tr. at 1996. The term "Licensee's Area" as used in the contract refers to Delaware County, Pennsylvania. See Plaintiff's Exhibit 1, Article I, ¶ A; see also Tr. at 1990–91. Defendant operated two Arthur Treacher's Restaurants in Delaware County—one in Sharon Hill and one in Drexel Hill. See Findings No. 7–9 infra.

4. The relief sought in the complaint is essentially the same but includes a request for a permanent injunction enforcing the terms of the covenant.

5. Tr. at 1980–2484.

defendant has held various jobs including dish washer, painter and boiler operator. After a period of service in the United States Army, defendant went into the business of home remodeling. On November 19, 1969, defendant became one of the first franchisees of ATFC when he entered into a Master Franchise Agreement with the plaintiff granting defendant the right to own and operate Arthur Treacher's restaurants in Suffolk County, New York. Defendant paid $40,000.00 for this franchise.

4. By 1970 defendant had invested $130,000.00, which amount represented his total savings including money obtained from the sale of his house, into the franchise. Pursuant to the Master Franchise Agreement entered into in 1969, defendant subsequently opened eight restaurants in Suffolk County, New York.

5. Prior to becoming an Arthur Treacher's franchisee, defendant had no experience in fast food operations. At the outset of their relationship, prior to opening his first store, defendant received training from plaintiff on how to operate an Arthur Treacher's restaurant.

6. Although initially trained by the plaintiff, it was primarily the efforts of defendant himself which caused his franchise to prosper. He served as a model franchisee training other franchisees and serving on various committees for the parent company assisting the franchisor in improving its own operations. The defendant was explicitly recognized by plaintiff as an outstanding and successful franchisee who developed his franchise by his own efforts and determination.

7. On December 23, 1974, defendant entered into a Master License Contract with the plaintiff granting defendant an exclusive right to own and operate Arthur Treacher's restaurants in Delaware County, Pennsylvania.

8. On December 20, 1975, pursuant to the Master License Contract entered into on December 23, 1974, defendant opened a restaurant in Sharon Hill, Pennsylvania (Delaware County). Defendant individually executed a Standard Unit License Contract

granting him a license to operate this restaurant as an Arthur Treacher's outlet.

9. In 1978, defendant opened a second store in Delaware County. This second store was located in Drexel Hill, Pennsylvania. Although defendant never executed a Standard Unit License Contract for the Drexel Hill restaurant, he assumed that the obligations were the same for his Delaware County operations.

10. Defendant has invested $700,000.00 in the two Delaware County restaurants.

11. None of the named defendants, other than Georgios Martinos, entered into the Master License Contract for Delaware County or the Standard Unit License Contract for Sharon Hill.

12. Neither Dorothy Martinos nor Trend Enterprises, Inc., both named as defendants, has had any connection with the two Delaware County stores.

13. North Atlantic Corporation, named as a defendant, was formed in 1974 and had operated the two Delaware County stores prior to their conversion to Gulliver's Fish & Chips restaurants. *See* Findings No. 24–26 *infra.* Defendant Georgios Martinos presently operates these two stores as a sole proprietor.

14. Beginning in 1969, ATFC has registered various trademarks with the United States Patent and Trademark Office, including the name "Arthur Treacher's Fish & Chips" and various other logos used in the business. Plaintiff, however, in its trademark registrations has specifically disclaimed any right to the exclusive use of the generic phrase "fish & chips."

15. The Standard Unit License Contract entered into by defendant for the Sharon Hill restaurant granted to him the right to use the various trademarks in return for defendant's agreement to pay royalties equal to the greater of $500.00 or 5% of monthly gross receipts.

16. In addition to paying royalties, defendant obligated himself to conform to plaintiff's specifications regarding the maintenance of a uniform image designed

to promote goodwill throughout the system. Plaintiff, on the other hand, additionally obligated itself to provide services to the defendant, including quality assurance and marketing services, in an effort to maintain a uniformly beneficial image.

17. Thus, the relationship between the plaintiff and defendant, as in most franchising systems, contemplated a cooperative venture designed to be mutually beneficial.

18. In the latter part of 1977 and through 1978 this relationship began to deteriorate. The level of services which had been provided prior to 1978 began to steadily decline. At this point in time, defendant lost faith in the Arthur Treacher's concept.

19. Defendant stopped paying royalties to plaintiff in July, 1979, because of the diminution in services and defendant's belief that plaintiff no longer cared about the system.

20. Plaintiff has named Mr. Martinos as a defendant in three other lawsuits filed on July 10, 1980, September 18, 1980 and March 19, 1981, in which plaintiff seeks, *inter alia*, payment of past due royalties. In response to these lawsuits Martinos raised defenses and asserted counterclaims that the plaintiff and additional defendant, Mrs. Paul's Kitchens, Inc. (the owner of ATFC at the time of the hearing) were in breach of the contracts and had violated the antitrust laws and were not entitled to any royalties.

21. By letter dated May 18, 1981, defendant was terminated by plaintiff as an Arthur Treacher's franchisee. The termination letter stated in part:

You are to immediately cease using Arthur Treacher's trademarks, service marks, processes and secrets and any variation of them immediately and redeliver all manuals and other Arthur Treacher's property at once. Furthermore, you are no longer entitled to utilize Arthur Treacher's established distribution systems. You are further to remove all distinguishing characteristics from the restaurant premises which would in any way identify them as Arthur Treacher's restaurants, and in particular, remove any and all signs, including, where applicable, the Mansard Roof sign within ten (10) days of receipt of this letter.[6]

Despite receipt of this letter, defendant continued to use the Arthur Treacher's trademarks up to January 5, 1982. *See* Finding No. 25 *infra.*

22. Subsequent to defendant's termination, any services which the plaintiff had been providing to defendant ceased altogether.

23. The present lawsuit was filed on January 5, 1982 and seeks to enforce the covenant not to compete. *See* note 3 *supra* and accompanying text.

24. Defendant joined with another terminated franchisee of ATFC, Agostine Malerba, *see* Finding No. 55 *infra*, in the use of the name "Gulliver's Fish & Chips." The purpose for joining Malerba in the use of the name Gulliver's was to take advantage of the economies of combined purchasing power.

25. On January 5, 1982, defendant replaced the "Arthur Treacher's Fish & Chips" signs at his two Delaware County stores with signs that denote the restaurants as "Gulliver's Fish & Chips." At about the same time, defendant stopped using the Arthur Treacher's trademark names for the products he was serving. The products themselves, however, remained essentially the same.

26. North Atlantic Corporation, which prior to this time had been operating the Delaware County stores, was merged into a new corporation, Sunrise Foods, Inc. This new corporation entered into an agreement for the use of the name "Gulliver's."

27. Defendant, now operating his two Delaware stores as a sole proprietor using the name "Gulliver's Fish & Chips," is utilizing essentially the same *types* of products that he used prior to being terminated as an Arthur Treacher's franchisee. Thus, defendant sells fish, particularly triangular

---

**6.** Plaintiff's Exhibit 4, ¶ 3; *see Tr.* at 2009.

shaped cod fish, dipped in a batter mix and fried in oil. Defendant sells chicken patties, also batter dipped and fried in oil. Defendant sells "ridged" potatoes or "chips." Defendant is using essentially the same methods to prepare these food items as he used prior to being terminated as a franchisee of ATFC with one change—defendant no longer uses the tempering process of plaintiff, a patented procedure whereby the temperature of the frozen fish is modified prior to cooking.

28. Defendant has made changes to his menu boards and uniforms, in addition to changing his signs, so that they are not the same as when he was an Arthur Treacher's franchisee.

29. Although defendant is selling *essentially* the same line of food items in his Delaware County restaurants, the products are nevertheless different from the products being sold by plaintiff in its company-owned stores located in Montgomery County, Pennsylvania, and are somewhat different from the products previously sold by defendant as an Arthur Treacher's franchisee.

30. The fish being sold by defendant is Icelandic cod which he purchases from Cold-water Seafood Corporation. There is no evidence that Coldwater ever limited the sale of this species of cod to Arthur Treacher's restaurants. On the contrary, defendant testified that Icelandic cod sold by Cold-water is generally available for sale to any restaurant. Furthermore, the company-owned stores in Montgomery County sell Canadian cod, a different species of fish.

31. Defendant does not use the batter developed and used by plaintiff. The batter used by defendant was developed by him, with the aid of Mr. Malerba, and is obtained from a different company than the company which supplied the defendant with batter as an Arthur Treacher's franchisee. Furthermore, the batter used by defendant is different from the batter utilized by plaintiff in its own stores in Montgomery County.

32. The chicken sold by defendant in his Delaware County restaurants is different from the chicken which he previously sold as an Arthur Treacher's franchisee.

33. Defendant is selling ridged potatoes, colloquially referred to as "chips," which he previously sold as an Arthur Treacher's franchisee. The restaurants owned and operated by plaintiff in Montgomery County do not sell ridge cut potatoes.

34. Defendant fries the food sold in his Delaware County stores in the same type of oil he used as an Arthur Treacher's franchisee. This oil, however, is different from the oil used by plaintiff in its own restaurants in Montgomery County.

35. As of the time of the hearing on this motion, defendant was in possession of copies of an operations manual prepared by plaintiff and given to defendant. Although defendant testified that he removed the manuals from his stores in July, 1981, he did not return them to plaintiff although requested to do so in the letter of termination sent in May, 1981. *See* Finding No. 21 *supra*. The evidence supports a finding, however, that the operations manual was not up-to-date in July, 1981, and was not being used by defendant at that time.

36. Seventy-eight to eighty-two percent of defendant's sales are "seafood related"— sales in which a seafood item is sold along with other items such as salad, beverage, etc.

37. Defendant does not have the equipment to sell hamburgers. The cost of obtaining equipment necessary to enable defendant to sell hamburgers would be between $90,000.00 and $110,000.00 per store.

38. The harm to defendant which would result from a preliminary injunction precluding him from selling seafood in the Delaware County restaurants would be significant. This harm includes the specific and very real possibility that such an order would force defendant to close his stores. That harm also includes the loss of goodwill which would result if defendant is preliminarily enjoined from selling seafood and defendant is later found to have been wrongfully enjoined.

39. Plaintiff recognizes that the preliminary injunction sought would probably result in the destruction of defendant's business as Gulliver's Fish & Chips. One of the presidents of plaintiff testified that defendant's situation is "a cancer in the body and we have to excise it or it will spread to others"[7] and thus Mr. Richard Baker testified that plaintiff seeks a judgment that the defendant "cannot operate as a fast food restaurant."[8]

40. Plaintiff is on the verge of bankruptcy.

41. At the time of the hearing on this motion, Mrs. Paul's Kitchens, Inc., the owner of plaintiff and named as an additional defendant on counterclaims filed in some of the cases comprising this multidistrict litigation, was in the process of negotiating for the sale of some or all of the assets of Mrs. Paul's Kitchens, Inc. and/or the plaintiff.

42. The restaurants owned and operated by the plaintiff are currently losing approximately $150,000.00 per week.

43. Approximately ten percent of Arthur Treacher's franchisees are currently paying royalties.

44. Within the last two years plaintiff has terminated the licenses of the operators of approximately 200 stores.

45. Within the last two years approximately thirty-five to forty franchised stores have closed in the eastern part of the United States.

46. Plaintiff closed approximately thirty company owned stores in 1981.

47. There was at one time at least 161 products not authorized by the plaintiff being sold by franchisees and there remains a lack of uniformity among the presently operating Arthur Treacher's franchisee stores. There is also a lack of uniformity between the products sold by the company stores and the products sold by franchisee stores. *See also* Findings No. 30, 33–34 *supra*.

48. Plaintiff presently employs one licensee district manager for the entire United States. A licensee district manager aids the licensees in the operations of their franchised stores and monitors those stores for the franchisor.

49. The present condition of plaintiff is such that it does not have the ability to adequately service new franchisee stores.

50. Since its acquisition by Mrs. Paul's Kitchens, Inc. in late 1979, plaintiff has not sold a franchise.

51. The persons at Arthur Treacher's to whom plaintiff delegated the responsibility for franchising—Messrs. Richard Baker, Joseph O'Neill, Joseph Verica and John Furey—have no prior experience with franchising.

52. Prior to November, 1981, plaintiff followed a routine procedure for responding to unsolicited requests for information about franchises and that was to send a form letter enclosing preliminary information about the plaintiff and thanking the person or company for their interest in Arthur Treacher's.

53. On November 15, 1981 and November 22, 1981, plaintiff placed in the *Philadelphia Inquirer* an advertisement for the sale of franchises. Advertisements were also placed in the *Washington Post* and the *Miami Herald*. There is no evidence that Arthur Treacher's ever advertised for franchisees prior to this time.

54. One of the presidents of plaintiff, Mr. Richard Baker, testified that the reason these three advertisements were placed, and no others, was due to plaintiff's desire to refranchise Delaware County, Pennsylvania, the City of Philadelphia, Pennsylvania, and Miami, Florida. Mr. Baker also testified that plaintiff was interested in selling additional franchises in the Washington, D.C. area, where plaintiff already had company owned stores.

7. *Tr.* at 2070.

8. *Id.; see also Tr.* at 2080 ("[defendant] continuing to operate as a fast-food restaurant, which also is in violation of the non-compete clause of the contract").

55. Agostine Malerba, formerly an Arthur Treacher's franchisee, operates Gulliver's Fish & Chips restaurants in the city of Philadelphia. There is presently pending in this multidistrict litigation a motion for a preliminary injunction against A&B Management Corporation, of which Mr. Malerba is president. This motion, like the one being considered herein, seeks to preclude A&B from operating its restaurants as seafood restaurants.

56. By November 15, 1981, many franchise restaurants had closed completely leaving many areas, including Bucks County and Chester County, Pennsylvania, without an Arthur Treacher's restaurant. Despite this fact, Mr. Baker testified that plaintiff was not interested in refranchising Chester or Bucks Counties.

57. The reason asserted by plaintiff for this decision to attempt to refranchise Delaware County but not Bucks or Chester Counties was the demonstrated success of defendant in Delaware County as opposed to the failure of other franchisees in Bucks and Chester Counties. The purported logic of this decision would be more acceptable had there been any evidence that the success of defendant was related particularly to his location in Delaware County. The clear weight of the evidence, however, demonstrates that defendant's success was primarily due to his efforts and determination and not particularly to any advantage in operating an Arthur Treacher's store in Delaware County as opposed to Bucks or Chester Counties.

58. Plaintiff received a total of approximately one hundred telephone calls in response to the advertisements.

59. Mr. Joseph Verica was primarily responsible for responding to the inquiries prompted by the advertisements. He received his directions from Mr. Baker and he was assisted by Messrs. O'Neill and Furey. *See* Finding No. 51 *supra.*

60. Although Mr. Baker testified that Mr. Verica was acquainted with the advertisements and the reasons that plaintiff was

advertising, Mr. Verica testified that he did not know about the advertisements until after they were published, nor did he know the reasons the advertisements were run— as far as he was concerned it was an "executive decision" to place the advertisements.[9]

61. Although Mr. Baker testified that the Philadelphia advertisement was placed specifically due to plaintiff's desire to refranchise Delaware County and the city of Philadelphia (areas formerly occupied by Messrs. Martinos and Malerba as franchisees of plaintiff and now occupied by them operating as Gulliver's Fish & Chips), Mr. Verica thought that the Philadelphia advertisement was intended to attract potential franchisees to the entire five county Philadelphia metropolitan area.

62. Although Mr. Baker testified that the *Washington Post* advertisement was aimed specifically at the District of Columbia and was not intended to relate to Maryland due to the presence of Arthur Treacher's franchisees in Maryland, Mr. Vercia believed that the advertisement was intended to apply to Washington, D.C. *only* and was not intended to apply to Maryland because plaintiff was not registered in Maryland.

63. Plaintiff responded to the inquiries prompted by the advertisements (*see* Finding No. 58 *supra*) by sending out a form letter thanking the inquirer for his interest and requesting that a financial statement be sent. This procedure differed from the prior policy for handling inquiries concerning franchises in that the financial statement of the person responding to the advertisement was requested and no information about the plaintiff was sent. *See* Finding No. 52, *supra.*

64. The only evidence of a response to the form letter and request for financial information (sent by plaintiff to those who initially responded to the advertisements) is that a few financial statements were sent to plaintiff but that these financial state-

**9.** *Tr.* at 2401.

ments "got mixed up with some other papers and they were inadvertently thrown out by the secretary."[10]

65. The advertisement placed in the *Philadelphia Inquirer* was not inserted for the purpose of selling franchises in Delaware County. The asserted purpose for this advertisement was to develop a "pool" of prospective franchisees which plaintiff would be able to pursue after the present conflict with defendant is resolved. Thus, plaintiff has no present intent to refranchise Delaware County because, according to Mr. Baker, "[i]t would not have been fair to [potential franchisees for Arthur Treacher's to pursue the refranchising] until this matter is resolved."[11]

66. Plaintiff was not in a position to make a "realistic proposal"[12] to a future franchisee as of November, 1981, when the advertisements were published.

67. It would cost a minimum of $750,000.00 to open a new Arthur Treacher's restaurant in Delaware County.

68. Delaware County, Pennsylvania has a population of approximately 592,200 and a geographic area of 184 square miles.

69. In 1978 plaintiff had a guide as to the amount of population necessary to support an Arthur Treacher's store—a population of 50,000 in a suburban area and 20,000 in a city area.

70. When defendant entered into the Master License Contract for Delaware County in 1974, he contemplated the opening of 8 to 10 restaurants in Delaware County. Defendant never carried out these plans due to his dissatisfaction with the Arthur Treacher's system. *See* Findings No. 7–10 and 18–19 *supra.*

71. Evidence adduced at the hearing supports a finding that Delaware County is big enough—both in size and population—to support fast food seafood restaurants in addition to the two Gulliver's Fish & Chips presently operating there.[13]

72. Defendant is not using any trademarks, tradenames, recipes or patents belonging to the plaintiff.

73. While an Arthur Treacher's franchisee, defendant served on several committees and councils in which capacity he was, at times, provided with confidential information by the plaintiff. The evidence on this issue introduced by plaintiff is limited to plaintiff's Exhibits 19, 20 and 21.[14] The evidence supports a finding that this information is either no longer confidential[15] or

---

10. *Tr.* at 2423. There appears to be only one instance on the record where plaintiff sent any information concerning itself to those who called in response to the advertisements. *See* Defendant's Exhibit 35; *Tr.* at 2423–24.

11. *Tr.* at 2102.

12. *Tr.* at 2102–03A.

13. Mr. Gerald P. Cusack, a licensee district manager employed by plaintiff (*see* Finding No. 48 *supra*) testified that he was at one time interested in obtaining a franchise in Delaware County due to the success defendant had there and due to the fact that "Delaware County could be developed further" due to its size. *Tr.* at 2247.
In addition, defendant, as well as Mr. O'Neill, one of plaintiff's employees to whom responsibility for franchising was delegated, gave testimony that the area from which defendant's stores draw customers is a one to three mile radius. *See Tr.* at 2249–50; 2377. While this testimony is unsubstantiated and of questionable probative value, it nevertheless lends some weight, albeit minimal, to the finding set forth in the text. *See also* Findings No. 68–70 *supra*. Plaintiff's assertion that the closing in Delaware County of two Long John Silver's restaurants, a competing fast food seafood chain, supports the claim that Arthur Treacher's could not compete in Delaware County with Gulliver's or that Delaware County is not big enough to support more than two fast food seafood stores, is unpersuasive in light of the clear weight of evidence to the contrary. Furthermore, the evidence established that Long John Silver's closed approximately 100 stores in the eastern United States, including thirteen stores in Philadelphia and in Bucks County, in addition to the two in Delaware County, thus detracting from any inference that any closings by Long John Silver's in Delaware County was related to the presence of Gulliver's stores there.

14. *Tr.* at 2172–75.

15. *Id.* at 2329–31.

is of no use to defendant and is not being used by him today.[16]

74. The evidence pertaining to any trade secrets which the plaintiff may possess is ambiguous and contradictory. Mr. Baker testified in a vague fashion that the cooking process is a trade secret—how the cooking medium is handled, the temperature and length of time a product is immersed, etc.[17] This testimony is buttressed somewhat by defendant's statement that a trade secret, in his understanding, is how one prepares food.[18] However, there is no evidence that the cooking process of Arthur Treacher's is unique to plaintiff or that it is secret or different from the way many fast food chains—including McDonald's, Burger King, Gino's, Howard Johnson's, Captain Dee's, Long John Silver's and Denny's—prepare batter dipped fried fish.[19]

75. The products presently being used by defendant are purchased outside of the Arthur Treacher's distribution system. *See* Findings No. 27–34, *supra.* Hence, the evidence does permit an inference that any processes unique to plaintiff, *e.g.,* temperature and "holding time," would no longer be used by defendant who is not using all the same products, particularly the batter, to which these processes apply.

## III. DISCUSSION

The moving party must clearly demonstrate that it is suffering irreparable harm before an injunction can issue pursuant to Federal Rule of Civil Procedure 65(a). In addition, the harm must be of an immediate and actual nature, as opposed to speculative future harm:

This Court has held that more than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a "clear showing of immediate irreparable injury," *Ammond v. McGahn,* 532 F.2d 325, 329 (3d Cir. 1976), or a "presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights, be those rights protected by statute or by the common law." *Holiday Inns of America, Inc. v. B & B Corporation,* 409 F.2d 614, 618 (3d Cir. 1969).

*Continental Group, Inc. v. Amoco Chemicals Corp.,* 614 F.2d 351, 359 (3d Cir. 1980). Other relevant factors to be considered in passing upon a preliminary injunction motion, assuming the movant surpasses the first hurdle of demonstrating irreparable harm,[20] include an assessment as to whether or not the movant has shown a reasonable probability of ultimate success on the merits. In addition, the amount of harm to the opposing party and to other interested persons as well as any harm which might accrue to the public interest ought to be considered where relevant. *Continental Group, supra* at 356–57.

The crucial issue presently before the Court is whether ATFC is being irreparably harmed *pendente lite* by Martinos' sale of seafood in the operation of his two Gulliver's Fish & Chips outlets in Delaware County.[21] The thrust of plaintiff's argument for a finding of irreparable harm is basically twofold.[22] First, that a *potential* franchisee will not come into Delaware County while

**16.** *Id.* at 2267.

**17.** *Id.* at 2135–38; *see also* note 27 *infra* and accompanying text.

**18.** *Id.* at 2287.

**19.** *Id.* at 2125; 2255–56; 2267–68; 2301; 2314; 2324.

**20.** *See Rumbaugh v. Beck,* 491 F.Supp. 511, 517 (E.D.Pa.), *aff'd,* 636 F.2d 1210 (3d Cir. 1980).

**21.** This Court has recently observed, concurring with Professors Wright and Miller, that the

demonstration of irreparable harm *pendente lite* is the most important prerequisite to the issuance of a preliminary injunction. *See Ecolaire, Inc. v. Crissman,* No. 81–2157, slip op. at 22–23 (E.D.Pa. Feb. 4, 1982).

**22.** The Court heard oral argument on this and other motions on March 15, 1982. The transcript was filed at Docket Entry No. 519. *See* pages 52–53 of that transcript for an exchange between the Court and plaintiff's counsel concerning the hurdle of demonstrating irreparable harm.

defendant is there, that some future licensee would not be interested in opening an Arthur Treacher's in Delaware County while Martinos is operating two Gulliver's.[23] The second aspect of plaintiff's argument for a finding of irreparable harm is that defendant's use of trade secrets belonging to plaintiff is causing irreparable harm to the plaintiff. *See* also note 31 *infra*.

Neither position withstands scrutiny. To enjoin preliminarily the sale of seafood by defendant in Delaware County, based upon the supposition that some potential franchisee will not want to purchase a Arthur Treacher's franchise in Delaware County unless Martinos is removed, would ignore the teaching of this Circuit that preliminary injunctions are not entered "simply to eliminate a possibility of a remote future injury." *Holiday Inns, supra*. The clear weight of the evidence in this case is that plaintiff is not now in a position to refranchise Delaware County and is not even going to attempt to do so until the "situation of plaintiff" improves and "this matter . . . is cleared up."[24] Furthermore, accepting for the sake of argument plaintiff's perception of the situation with regard to refranchising, the inference can readily and logically be drawn that a grant of the preliminary relief sought would not serve to relieve the plaintiff of any hypothetical injury *presently* being suffered. If some future franchisee presently would be unwilling to open a store in Delaware County due to the presence of Martinos, then surely that same prospective franchisee is not going to enter Delaware County and invest a minimum of $750,000.00[25] to open an Arthur Treacher's on the strength of a preliminary injunction

entered against defendant. Even *assuming* the presence of Martinos is a major deterrent to entering the Delaware County market, as plaintiff has argued, surely any businessman would want to wait at least until the validity of the covenant is determined at a *final hearing* before making a commitment to opening a franchise in Delaware County.

The evidence regarding purported trade secrets of Arthur Treacher's is, at best, nebulous at this point. Even if one could peer through the haze to find as a matter of fact that some aspect or aspects of the food preparation technique of plaintiff is a trade secret, a task which this Court does not consider possible on the present state of the record, the evidence is contradictory as to whether or not defendant is presently utilizing the purported trade secrets. In short, after carefully reviewing the evidence, this Court cannot say what the trade secrets of plaintiff are, or whether defendant is presently using them, if any.

Although the Court at this point does not believe that an adequate factual predicate exists upon which to resolve the question of what trade secrets are possessed by plaintiff and whether they are being used by defendant, the question of what is a trade secret is a legal question. *Anaconda Co. v. Metric Tool & Die Co.*, 485 F.Supp. 410, 414 (E.D.Pa.1980). Based upon the facts which the Court does know, the following comments are offered.

Both Pennsylvania and Ohio have adopted the definition of trade secrets found in Comment b to the Restatement of Torts § 757 (1939).[26] *College Watercolor Group*

---

**23.** To attempt to buttress the contention that prospective franchisees would not enter Delaware County because of Martinos' presence, plaintiff repeatedly pointed to the fact that two Long John Silver's closed in Delaware County while repeatedly ignoring the fact that Long John Silver's closed many stores at about the same time and that there was no evidence that the closing of Long John Silver's in Delaware County was in any way related to the presence of Martinos' stores. *See* note 13 *supra*.

**24.** *Tr.* at 2076–77; *see* Finding No. 65 *supra*.

**25.** *See* Finding No. 67 *supra*.

**26.** The contract has a choice of law provision calling for the application of Ohio law. At one point in the proceedings, the Court asked the parties if it would be possible to agree upon the applicable state law and they responded that they were not able to arrive at a stipulation. *See Tr.* at 2232–33. Although the parties could not agree as to whether Pennsylvania or Ohio law should control, they seem to agree that it may not matter. Defendant states in his Proposed Conclusion of Law No. 13 that the "choice of law questions may not be significant

*Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200 (1976); *B.F. Goodrich Co. v. Wohlgemuth*, 117 Ohio App. 493, 192 N.E.2d 99 (1963). That definition states in part:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers ... Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article.

. . . . .

The subject matter of a trade secret must be secret. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there

would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Restatement of Torts § 757, Comment b at 5–6 (1939).

We know in this case that plaintiff generally claims that its cooking process is a trade secret:

Q. What else do you know to be a trade secret?

A. You are getting into the back kitchen where I have never operated but because that is primarily where they, the trade secrets, would arise, but it would be, I would think, how the—cooking medium is handled, the temperature at which it is maintained, the length of time that the product is immersed in the cooking oil; I would think also the experience with how long the fish could be held after cooking, because when you are dealing with a fast-food operation you have to cook sometimes in anticipation of what you are going to sell and you have to know how long you can keep it, whether it be five minutes, or a half an hour.

---

here since the fundamental policy of both Ohio and Pennsylvania preclude enforcement of the covenant not to compete at issue." Plaintiff approaches the question from the opposite angle, of course, stating in its Proposed Conclusion of Law No. 2 that "[s]ince the covenant in this case is enforceable under both Ohio and Pennsylvania law, there is no conflict of law issue to be resolved by this court." *See also* Plaintiff's Proposed Rebuttal Conclusion of Law No. 25.

Because the present decision is based upon a failure to demonstrate irreparable harm, and not upon any assessment of plaintiff's ultimate case on the merits, the Court has avoided for now a discussion of the choice of law issue. *See Continental Group, supra*, 614 F.2d at 353 n.1, 359 n.10. To the extent that an examination of the trade secret issue is necessary to an analysis of the question of irreparable harm, it appears that Pennsylvania and Ohio law does not significantly vary with regard to the definition of trade secrets.

These are things that have been learned by—by trial and error and they become trade secrets.

It would be very valuable for a competitor to know that.

I think there are certain ways of—of handling the—the training of personnel, the staffing of the—of a restaurant, the duties that those people would perform, the level of competence that they might need.

You are getting into all of these areas; the entire operation of a business in—in this fashion would be trade secrets.

It would—it would go to the heart of what you are training a new employee or a new licensee to do so he will know how to successfully run his business.

These are all trade secrets.[27]

There is no evidence, other than the above testimony, that the temperature at which plaintiff fries food, or the length of time the food is immersed in oil, or the length of time the food is held after frying, is a trade secret of plaintiff's or is even any different from the process used by plaintiff's competitors.[28] Moreover, hundreds and probably thousands of present and for-mer employees of Arthur Treacher's undoubtedly know plaintiff's cooking process. Although the contract entered into by defendant contains a clause calling for the maintenance of confidentiality,[29] there is no evidence that plaintiff attempted to ascertain if this clause was being enforced. Aside from this clause in the contract there is no evidence that plaintiff took any steps to ensure that "a substantial element of secrecy" would exist with regard to its processes for preparing food, for example.

Finally, in the Court's view, anyone with a modicum of intelligence who desired to enter into this business could, with relative ease, develop such processes as an appropriate temperature in which to fry breaded fish and the maximum period of time it would be desirable to hold that fish for sale after it was cooked. In short, because the plaintiff has failed to prove at this stage that it possesses legally protectable trade secrets being misappropriated by the defendant, the Court rejects plaintiff's argument that it is being irreparably harmed by defendants' use of its trade secrets. *Cf. Ecolaire, Inc. v. Crissman*, No. 81–2157, slip. op. at 22–25 (E.D.Pa. Feb. 4, 1982).[30]

---

**27.** *Tr.* at 2137–38.

**28.** *See* Finding No. 74 *supra.*

**29.** Plaintiff's Exhibit 2, Article V, ¶ A.

**30.** Plaintiff has cited this Court's recent decision in *Ecolaire* for the proposition that "the use by an employee of his former employer's confidential information or trade secrets has been found to be irreparable harm warranting injunctive relief. *United Insurance Company of America v. Dienno*, 248 F.Supp. 553 (E.D.Pa. 1965)." *Id.* at 24. While this statement of law is easily accepted and applied in the factual setting that confronted this Court in *Ecolaire*, the concept is of little use in the present case. In the first place, this Court in *Ecolaire* found the existence of numerous trade secrets, the most important of which were detailed engineering drawings which would enable one to manufacture replacement parts for ash handling systems. *See id.* at 3, Findings No. 2 and 3. Plaintiff established that these drawings contain valuable proprietary information enabling plaintiff to maintain a distinct advantage over its competitors in the replacement parts business. Furthermore, plaintiff took reasonable precautions, through long standing compa-ny policy, to keep these drawings from the public domain. *Id.* at 27.

Second, the record in *Ecolaire* disclosed a clear case of misappropriation of these trade secrets by defendants. *Id.* at 29. Third, there were instances in *Ecolaire* where the defendant deliberately "passed off" its products as those originating with the plaintiff. Finally, a case for tortious interference with plaintiff's contractual rights was preliminarily established. *Id.* at 24–25.

Considering the circumstances and evidence in the present case, Arthur Treacher's has not established to the satisfaction of this Court the degree of harm that was clearly evident in *Ecolaire* which would warrant preliminary relief. Furthermore, defendant would be harmed significantly by a grant of this preliminary relief. *See* Findings No. 36–39, *supra.* Even if the Court were able to find in this case, as it did in *Ecolaire*, that the trade secrets and other confidential information of plaintiff were being misappropriated, then the appropriate relief would probably be an injunction precluding the use of the trade secrets *pendente lite*, and not an injunction enforcing the covenant in full at this preliminary stage—relief which the Court has already found would probably put the de-

Finding that plaintiff has failed in its burden to prove irreparable harm,[31] the Court finds it unnecessary to assess plaintiff's chances of ultimate success on the merits.[32] An order will be entered denying the motion.[33]

fendant out of business. *Cf. Ecolaire, supra* at 34–36.

31. The Court has considered and rejects plaintiff's contention that irreparable harm "flows as a matter of law from a finding that the Martinos Defendants are in violation of the covenant not to compete." Plaintiff's Proposed Conclusion of Law No. 8. *Actual Proof of irreparable harm* is a prerequisite to the issuance of a preliminary injunction to enforce a covenant not to compete. *New Castle Orthopedic Associates v. Burns*, 481 Pa. 460, 467, 392 A.2d 1383, 1387 (1978). *See* Defendants' Proposed Conclusions of Law Nos. 17–21. There is no such proof in this case.

The Court has also considered and rejects plaintiff's contention that irreparable harm flows from defendant's continued operation of a "mirror image seafood restaurant." Plaintiff's Proposed Conclusion of Law No. 9. In the two cases relied upon by plaintiff for this proposition, *Koppers Co., Inc. v. Krupp-Koppers GmbH*, 517 F.Supp. 836 (W.D.Pa.1981) and *Fotomat Corp. v. Photo Drive-Thru, Inc.*, 425 F.Supp. 693 (D.N.J.1977), the respective courts found evidence of confusion from the defendants' use of similar names or logos, etc. *Koppers*, 517 F.Supp. at 842–43; *Fotomat*, 425 F.Supp. at 698. There is no comparable evidence of confusion in this case other than the selfserving and unsupported statement of plaintiff's president that "in the perception of the average customer, he is still an Arthur Treacher's." *Tr.* at 2071. There is no evidence supporting this statement. Rather, the Court is asked to presume confusion on the part of the public because defendant is operating at the same locations selling similar products. The evidence, however, more reasonably supports the conclusion that the change in name to Gulliver's, the discontinued use of plaintiff's trademarks, the change in menu boards, uniforms, interior and exterior signs, the use of batter, fish, chicken and potatoes different than those comparable products currently being sold in plaintiff's company stores in neighboring Montgomery County, all add up to a finding of no confusion on the part of the average customer. *See* Findings No. 27–34 *supra*.

32. *See* note 20 *supra*, and accompanying text.

33. The Court is mindful that this litigation is in a state of flux and some of the facts found herein may have changed after the close of evidence and during the drafting of this opinion. *See, e.g.,* Wall Street Journal, April 1, 1982, § 2, at 34, col. 3, (reporting the sale of plaintiff). However, this ruling is, of course, based upon the facts of record as of the close of evidence on February 11, 1982. To the extent that any party may feel that any change in the facts could alter the Court's decision then recourse *may* lie in a request for reconsideration, setting forth on the record any new facts and how those facts could change the Court's ruling.

The Court is not explicitly inviting such a motion. Counsel are admonished to carefully assess the basis for this decision when considering whether any new facts would alter it.